JANE DOE *vs.* HARBOR SCHOOLS, INC., & another.[1]

No. 02-P-975.

Essex. November 6, 2003. - April 28, 2005.

Present: GREENBERG, BERRY, & McHUGH, JJ.

Further appellate review granted, 445 Mass. 1101 (2005).

*Limitations, Statute of. Practice, Civil,* Statute of limitations. *Fiduciary.*

In a civil action brought in Superior Court in 1997 against a residential home for young women (home) and its supervisor, arising out of what the plaintiff claimed were the adverse psychological consequences of sexual activity in which the plaintiff and the supervisor had engaged while the plaintiff resided at the home, the judge correctly granted summary judgment in favor of the defendants on the plaintiff's claims of assault and battery, intentional infliction of emotional distress, and negligent supervision on the ground that such claims were barred by the three-year statute of limitations set forth in G. L. c. 260, § 2A, where the record established that the plaintiff knew facts sufficient to provide her with the modicum of knowledge required to trigger the statute of limitations before the end of November, 1993, and that it was not objectively reasonable for the plaintiff to have delayed filing her claims for more than three years after that date. [342-345]

In a civil action brought in Superior Court against a residential home for young women (home) and its supervisor, arising out of what the plaintiff claimed were the adverse psychological consequences of sexual activity in which the plaintiff and the supervisor had engaged while the plaintiff resided at the home, the judge erred in granting summary judgment in favor of the defendants on the plaintiff's claim of negligent breach of fiduciary duty on the ground it was barred by the three-year statute of limitations set forth in G. L. c. 260, § 2A, where the record created genuine issues of material fact regarding whether a fiduciary relationship existed between the plaintiff and the supervisor [345-348] and, if it did, when the plaintiff's knowledge of the supervisor's breach of his fiduciary obligations arose or he clearly and unequivocally communicated to the plaintiff his repudiation or abandonment of those obligations [348-350].

CIVIL ACTION commenced in the Superior Court Department on January 23, 1997.

The case was heard by *Joseph A. Grasso, Jr.,* J., on motions for summary judgment.

[1] Glen Freeman.

*Richard J. Fallon* for the plaintiff.

*Deirdre H. Robbins* for Glen Freeman.

*Michael D. Riseberg* for Harbor Schools, Inc.

McHugh, J. Jane Doe appeals from a summary judgment in favor of the defendants, Harbor Schools, Inc. (Harbor Schools), and Glen Freeman, dismissing her claims for assault and battery, negligence, intentional infliction of emotional distress, and negligent supervision. All of the claims arose out of what the plaintiff claims were the adverse psychological consequences of sexual activity in which the plaintiff and Freeman engaged while the plaintiff resided in a facility where Freeman was her counsellor. A judge of the Superior Court ordered entry of the judgment after he concluded that the statute of limitations barred the plaintiff's claims. We affirm in part and reverse in part.[2]

1. *Facts and procedural background.*[3] The plaintiff first met Freeman in April, 1992, when she began living at Harbor Schools' residential home for young women in West Newbury (home). At the time, the plaintiff, who was born on November 11, 1974, was seventeen and one-half years old. The Harbor Schools program was designed to provide young women with independent living skills to help them in their transition to adulthood. At all relevant times, Harbor Schools employed Freeman as the home's supervisor.

Before the plaintiff entered the home, she had run away from an abusive home. She also had experienced a series of foster-care placements, periods of homelessness, and incidents of sexual abuse. Most recently, she had been living in a residential program in Marlborough. On her seventeenth birthday, she became too old for the Marlborough program and was transferred to the home, where four other women in their late teens were already residing.

Upon the plaintiff's arrival, Freeman introduced himself as

[2]The plaintiff's complaint also named as defendants the Commonwealth of Massachusetts (Department of Social Services), and Consilio Hispano, Inc. A default judgment was entered against Consilio Hispano, Inc., on November 14, 1997, and on August 10, 1998, by stipulation of the parties, all claims against the Commonwealth were dismissed.

[3]As in all cases where the plaintiff appeals from an adverse summary judgment, we view the facts in the light most favorable to the plaintiff. See *Riley* v. *Presnell,* 409 Mass. 239, 240-241 (1991).

her "one-on-one" counsellor. Initially, Freeman told the plaintiff that he was required to see her once each week for counselling. From the beginning, however, Freeman initiated more frequent contact and actually met with the plaintiff two to three times weekly throughout the spring and summer of 1992. Freeman encouraged the plaintiff to reveal personal information about herself, including information about past sexual relationships, telling her that the revelations were necessary to help her "work on her issues." As a result, and because Freeman promised to keep what she said confidential, the plaintiff reluctantly shared with him feelings and information that she had never before disclosed to anyone.

As their encounters proceeded during the summer of 1992, Freeman told the plaintiff that other employees and residents of the home did not like her but that he loved her. He tutored her, picked her up from school, taught her how to drive, and frequently took her to dinner. Freeman also told the plaintiff about his own life history and complained to her that "he did not love his wife and never got any sex."

In the fall of 1992, Freeman began massaging the plaintiff's back and hugging her when she was upset. As a consequence, the plaintiff sensed that the "counsellor relationship" had changed to a friendship, although Freemen had not said anything to suggest that he was no longer her counsellor. Early in 1993, after the plaintiff told Freeman that she was becoming increasingly depressed and nervous, he encouraged her to follow the advice of a psychiatrist she was seeing at the time and begin a course of antidepressant medication. Freeman bought the plaintiff Christmas gifts, roses on Valentine's Day, and in May of 1993, paid $2,000 toward the approximately $3,000 purchase price of a car she had decided to buy.

In the early spring of 1993, Freeman kissed the plaintiff for the first time. She was "puzzled [and] confused" and "uncomfortable" with that contact "[b]ecause he was [her] counsellor and he was married." Soon thereafter, upon Freeman's initiative, the plaintiff twice engaged in fellatio with him — once in her bedroom and once in his house. After the second incident, she told Freeman she wanted to "just be friends." Freeman agreed. According to the plaintiff, she was not attracted to

Freeman. She was afraid to tell anyone about the sexual contact because she had been "kicked out" of a foster home after complaining that she had been raped and thought that Freeman would probably try to cast blame on her if she complained about his conduct. She consented to the sexual acts "because [Freeman] had been very nice" to her and she wanted to please him.

In June, 1993, the plaintiff, then eighteen and one-half, left the home and moved to an "independent living" setting in the home of a Harbor Schools employee. Her move marked the end of formal "one-on-one" visitations she had been having with Freeman, although he continued to visit her once or twice each week. Shortly after she moved, however, a Harbor Schools employee told the plaintiff that she could no longer see Free-man because she was now living in a new setting. The employee also told the plaintiff that Freeman had been told to end his relationship with her but had elected to continue it. Upon receiv-ing this news, the plaintiff "fell apart" because she was no longer to see "[t]he only person [she] loved and [who] loved [her]." Shortly thereafter, the plaintiff, feeling that she "had nobody" and "couldn't bear living without" Freemen, attempted to commit suicide by swallowing a bottle of Klonopin pills.

Following her suicide attempt, the plaintiff was hospitalized. While she was there, Freeman telephoned her almost every day, telling her, among other things, that he had been fired for com-ing to see her but that he still loved her and that "nobody would stop [them] from seeing each other." He also asked her to refrain from telling anyone about their relationship.

After the plaintiff's release from the hospital in late June or early July, 1993, she began to view her relationship with Free-man as "negative" and told him she wanted to break it off. He agreed to end the relationship. Despite his agreement, Freeman contacted the plaintiff in November saying he wanted to see her. By then, the plaintiff's boyfriend, whom we shall call Joseph, had told her that she should not be seeing Freeman because their relationship was "unhealthy." She agreed, know-ing at the time that she had "ended up in the hospital" because of the relationship. She nevertheless agreed to meet with Free-man and, at the ensuing November meeting, told him that she

did not want to see him, that she "didn't like him anymore," and that he was causing her "emotional problems."

Freeman and the plaintiff saw each other one last time in the early summer of 1994. During that encounter, they argued over their relationship and over Joseph because Freeman felt that the plaintiff "shouldn't settle or go out with" Joseph. This last meeting was followed by a "nasty" letter from Freeman that left the plaintiff feeling angry, prompted her to seek a restraining order, and led her to tell Joseph about Freeman's sexualization of their relationship. On August 5, 1994, Freeman sent another letter, this one to Joseph, in which he stated that the plaintiff had AIDS, that he had reported her for scholarship fraud, and that he had reported Joseph and his father to the Internal Revenue Service for tax fraud.

On September 14, 1994, the plaintiff began seeing a licensed clinical social worker for depression, panic disorder, and post-traumatic stress disorder. In a treatment summary she wrote on August 10, 1999, the social worker opined that the plaintiff's symptoms were primarily a result of an abusive relationship with Freeman and that the plaintiff had only begun "[o]ver the last two years" to understand that the "relationship [w]as an abusive one, not . . . a love affair that was wrong."[4] Unlike the plaintiff's reactions to prior incidents of sexual abuse, she had "assumed responsibility for her choice and felt guilty" because the abuse had "occurred in the context of what she assumed was a nurturing and loving relationship." In the social worker's view, however, the plaintiff "was not capable of consenting to a sexual relationship as an equal partner" because of the "imbalance of power, the difference in age, and [the plaintiff's] extreme vulnerability." In the social worker's view, the plaintiff had engaged in sexual acts with Freeman because she was "grateful" and "desperate not to lose him . . . [as he] appeared to be the idealized parent she had always longed for." Nevertheless, the plaintiff knew at the time of the acts that "it was mor-

[4]Harbor Schools asserts that the social worker's summary is patently unreliable because, taken literally, the portion just quoted would mean that the plaintiff did not discover the abusive nature of the relationship until about seven months after she filed the complaint. On the view we take of this case, the content of the summary is not dispositive.

ally wrong to have sex with a married man and to have sex with [her] counsellor."

On January 23, 1997, the plaintiff filed her complaint in Superior Court. The complaint alleged that the plaintiff had relied on Freeman to take care of her and to act in her best interest "[b]ecause of her minority and because of the fiduciary relationship" that existed between them. The complaint went on to allege claims for assault and battery, negligence, intentional infliction of emotional distress, and insofar as Harbor Schools was concerned, negligent supervision, each of which was based on the sexual contact Freeman had initiated.[5]

In response to the complaint, both Freeman and Harbor Schools filed motions for summary judgment, asserting that the statute of limitations barred the plaintiff's claims because they had accrued in the spring or summer of 1993, or at the latest, in November, 1993, and thus, more than three years before the complaint was filed. A judge of the Superior Court allowed the motion, ruling that the undisputed record established that, by the summer or the fall of 1993, the plaintiff was aware that she had been harmed by Freeman's conduct.

2. *Discussion.* Those facts inform our discussion of the plaintiff's claims. Each claim, including the claim of negligent breach of fiduciary duty, sounds in tort, and is therefore subject to the three-year statute of limitations found in G. L. c. 260, § 2A. See *Lattuca* v. *Robsham*, 442 Mass. 205, 212 (2004). Generally, a tort action accrues at the time the plaintiff is injured. See *Cannon* v. *Sears, Roebuck & Co.*, 374 Mass. 739, 741 (1978); *Stark* v. *Advanced Magnetics, Inc.*, 50 Mass. App. Ct. 226, 232 (2000). In this case, sexualization of the counselling relationship occurred in the spring of 1993, almost four years before the plaintiff filed her claim. Because all of the plaintiff's claims flow from that sexual activity, and because she undeniably was aware contemporaneously that the sexualization was occurring, her action is barred unless the statute began to run at some point after January 23, 1994.

---

[5]The complaint and the summary judgment papers focused entirely on the sexual component of the plaintiff's relationship with Freeman. No claim was based on the letters Freeman wrote to the plaintiff or to Joseph in the summer of 1994.

The plaintiff argues that the statute did begin to run after January 23, 1994. More specifically, she claims to have first discovered the relationship between Freeman's actions and her psychological difficulties during the course of psychotherapeutic treatment she began receiving in September, 1994. Before that treatment began, she claims, she neither knew nor reasonably should have known of the connection between her psychological difficulties and Freeman's conduct. In her view, she is, therefore, entitled to the benefits of the so-called "discovery rule" and her complaint was timely.

Under the "discovery rule," the limitation period starts when "the connection between the defendant's actions and the plaintiff's alleged injury becomes either known or knowable." *Doe* v. *Creighton*, 439 Mass. 281, 283 (2003). See *Riley* v. *Presnell*, 409 Mass. 239, 243-244 (1991). The rule was adopted to avoid the unfairness of barring a plaintiff's claim for "damages based upon harm which was 'inherently unknowable' at the time of the tortious conduct." *Krasnow* v. *Allen*, 29 Mass. App. Ct. 562, 568 (1990). The rule has been applied to financial, physical, and psychological injuries, see, e.g., *Hendrickson* v. *Sears*, 365 Mass. 83, 90-91 (1974); *Franklin* v. *Albert*, 381 Mass. 611, 618-619 (1980); *Riley* v. *Presnell*, *supra*, and to cases where, although the plaintiff knew of her harm, she was unaware of its cause. *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 208 (1990). The rule does not, however, serve to toll the statute until the plaintiff discovers each element of her cause of action, *id.* at 208-209, or the "full extent or nature of her injury." *Palermo* v. *Brennan*, 41 Mass. App. Ct. 503, 508 (1996). Rather, the statute is triggered if the plaintiff has "(1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was." *Bowen* v. *Eli Lilly & Co.*, 408 Mass. at 208. See *Sheila S.* v. *Commonwealth*, 57 Mass. App. Ct. 423, 425 (2003). The "sufficient notice" component of that standard is an objective, not a subjective, component. See *Doe* v. *Creighton*, *supra* at 284.[6]

We think that proper analysis of the plaintiff's claims must proceed on two separate tracks. The first applies to all of the plaintiff's claims save her claim for negligent breach of

---

[6]In determining what is "objectively reasonable,"

fiduciary duty. We look at the timeliness of those claims in the light of the discovery rule.[7] The second track involves the claims for breach of fiduciary duty. The timeliness of those claims turns on when the plaintiff actually knew that Freeman had breached any fiduciary obligation he may have had to her. We also think that the statute of limitations ran on all claims, save the claim for breach of fiduciary duty, before the complaint was filed.

a. *Non-fiduciary claims.* As noted earlier, the plaintiff believed at the time of her sexual contact with Freeman that it was "morally wrong to have sex with . . . [her] counsellor." She elected to end the sexual component of her relationship with Freeman shortly after it began and before she moved out of the home in June of 1993. By late June or early July of 1993, the plaintiff knew that Harbor Schools had told Freeman to end their relationship and had fired him for continuing it. No later than early July of 1993, she herself believed that the relationship was a "negative" one. By November of 1993, the plaintiff believed that the relationship was responsible for her suicide attempt and ensuing hospitalization. No later than the end of that month, she

---

"[w]e examine the reasonableness of the plaintiff's delay in filing suit from the perspective of 'a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint.' This is not, however, a subjective test; the only individualized characteristics are those that stem directly from the complained-of tort. . . . Personal traits unrelated to the tort, such as cultural background and educational history, are not relevant to the reasonableness inquiry. We focus instead on the nature of the abusive conduct, the injuries that the abuse inflicted, and the effect that both would have had on the causal understanding of an ordinary, reasonable person." (Citations and footnotes omitted.)

*Doe* v. *Creighton,* 439 Mass. at 284.

[7]The defendants claim that the discovery rule has no applicability to what they characterize as a consensual sexual relationship between two adults because Freeman was not Doe's psychiatrist, psychologist, or social worker. The result we reach makes it unnecessary to explore that question. Instead, like the motion judge, we proceed on the assumption that the discovery rule applies. The defendants also appear to claim that the discovery rule somehow is limited to claims for improper handling of the "transference" phenomenon. See generally *Simmons* v. *United States,* 805 F.2d 1363, 1364-1366 (9th Cir. 1986). See also *Palermo* v. *Brennan,* 41 Mass. App. Ct. at 506 n.5. Our result likewise makes exploration of that claim unnecessary.

realized that the relationship was "unhealthy" and was causing her "emotional problems." Indeed, although her expert's treatment summary says that the plaintiff "was incapable of consenting to a sexual relationship [with Freeman] as an equal partner," and that it took her some years to realize that the relationship was "abusive, . . . not . . . a love affair that was wrong," the expert does not say that the plaintiff failed to recognize before the end of November, 1993, that her relationship with Freeman had caused her substantial emotional harm.

Under those circumstances, we think that the facts the plaintiff knew were "sufficient to provide her with the modicum of knowledge required to trigger the statute of limitation," *Phinney* v. *Morgan*, 39 Mass. App. Ct. 202, 209 (1995), before the end of November, 1993, even if she were not by then aware of the nature of the claims she might have against him. We also think that, given what she knew, it was not objectively reasonable for her to have delayed filing her claims for more than three years after November 30, 1993. See generally *Doe* v. *Creighton*, 439 Mass. at 284-285; *Lijoi* v. *Massachusetts Bay Transp. Authy.*, 28 Mass. App. Ct. 926, 928 (1990) ("Where injury is present but not discernible, or an injury is recognized but its cause is not ascertainable, accrual of the cause of action is held to be in abeyance until the time when a modicum of knowledge supplants ignorance in the mind of the claimant, or may be reasonably imputed to her").

b. *Breach of fiduciary obligation.* Both the analysis and the result are different insofar as the claims for breach of fiduciary duty are concerned. Such a breach may arise either from an intentional or a negligent act. See *Clark* v. *Rowe*, 428 Mass. 339, 345 (1998). In either case, neither constructive knowledge nor objective reasonableness determines when the statute begins to run. See *Lattuca* v. *Robsham*, 442 Mass. at 213. Instead, the limitations period begins when the beneficiary actually learns that the fiduciary has breached the trust. See *id.* See also *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 520-521 (1997) ("The objective standard of reasonableness . . . does not displace the actual knowledge standard that has been applied to . . . conduct involving a repudiation of trust"). Put another way, the statute of limitations does not begin to run

on a claim for breach of a fiduciary duty until the trustee's repudiation of the trust "has come home to the [beneficiary]." *Akin* v. *Warner*, 318 Mass. 669, 676 (1945).

For the plaintiff to take advantage of the actual knowledge rule, she must, of course, prove that a fiduciary relationship existed between her and Freeman. Such a relationship can arise in a wide variety of circumstances, because "[a] fiduciary is a person having a duty, created by his or her undertaking, to act principally for the benefit of another in matters connected with that undertaking." *Bailey* v. *Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992). See Restatement (Second) of Torts § 874 comment a (1974) (fiduciary's duty is to "act for . . . the benefit of [the other] upon matters within the scope of the relation"); 1 Scott & Fratcher, Trusts § 2.5 (4th ed. 1987).

Some relationships are, as matter of law, fiduciary in nature — for example, the relationship between lawyer and client, "trustee and beneficiary, director and corporation, [or] guardian and ward." *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 442 (1980). In other circumstances, however, the question whether a fiduciary relationship exists is one of fact, see, e.g., *Hayes* v. *Moulton*, 194 Mass. 157, 165 (1907), typically requiring the fact finder to determine whether one party confided in or relied upon another party for a particular purpose. See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, *supra* at 443-444. See generally *Hawkes* v. *Lackey*, 207 Mass. 424, 433 (1911) (fiduciary duties "owed by one party to another, either by reason of confidence having been reposed in the former or because of a duty having been created by law"); *Sullivan* v. *Rooney*, 404 Mass. 160, 163 (1989); Dobbs, Torts § 102, at 239 (2000) (the scope of the relationship is not defined by "status or profession . . . [but] the . . . roles undertaken" by the alleged fiduciary). Stated differently, a fiduciary "relationship arises because one party desires a benefit or service from another party which requires [her] to entrust power to the other party." Jorgenson & Randles, Time Out: The Statute of Limitations and Fiduciary Theory in Psychotherapist Sexual Misconduct Cases, 44 Okla. L. Rev. 181, 196 (1991).

In determining whether a fiduciary relationship exists as a matter of fact, several factors require consideration. One is

whether the circumstances surrounding the relationship would lead a reasonable person to believe he or she could confide in, or rely on, the other for a particular purpose. See *Cann* v. *Barry*, 293 Mass. 313, 316-317 (1936) (fiduciary relationship existed where the plaintiff was confined to bed and the defendant gained plaintiff's confidence and purported to act in his best interest); *Warsofsky* v. *Sherman*, 326 Mass. 290, 293-294 (1950) (fiduciary relationship existed where the defendant was a bank official and the plaintiff met him during working hours seeking financial assistance from the bank). A second concerns the relative degree of skill or expertise the alleged beneficiary and fiduciary possess with respect to the matters the fiduciary relationship allegedly covers. See *Broomfield* v. *Kosow*, 349 Mass. 749, 755 (1965) (court considered "the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance"); *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. at 444 (fiduciary relationship may be found where plaintiff is "in fact dependent on another's judgment"). A third is whether the putative fiduciary knew of the plaintiff's reliance. See *Reed* v. *A.E. Little Co.*, 256 Mass. 442, 448-449 (1926) (fiduciary relation "where one party reposes confidence . . . and the other party in advising voluntarily assumes and accepts the confidence"); *Broomfield* v. *Kosow*, *supra* ("The catalyst [for formation of a fiduciary relationship] is the defendant's knowledge of the plaintiff's reliance upon him"); *Davidson* v. *General Motors Corp.*, 57 Mass. App. Ct. 637, 642 (2003) (alleged fiduciary must be "aware of the plaintiff's reliance").

We think that, at the very least, the record in this case creates a genuine issue of material fact regarding whether a fiduciary relationship existed between the plaintiff and Freeman. Freeman was the plaintiff's counsellor and urged her to confide in him. She did confide in him and he knew she was doing so. Both his urging and her compliance occurred in a setting that had been designed to help her, and others similarly situated, with transitional issues. She knew that and Freeman knew that. As between the two, he, the hired staff counsellor, was the one who had the greater experience and expertise in dealing with transitional issues of the type with which she needed help.

Under all of those circumstances, a fact finder could conclude that a fiduciary relationship existed between Freeman and the plaintiff and required Freeman to use his contacts with the plaintiff solely to help her, not himself.[8]

On this record, there is also a genuine issue of material fact as to when the plaintiff actually knew — when it came home to her — that Freeman had breached his fiduciary duties to her. As noted, she clearly knew contemporaneously of the sexualized nature of their relationship, knew it was wrong to have sexual relations with her married counsellor, and knew well before January 24, 1994, that the relationship was causing her psychological harm. But the relevant question is whether the plaintiff actually knew before January 24, 1994, that Freeman was not just causing her psychological harm but was by his acts breaching the fiduciary obligations he had assumed. And where psychological injuries are at issue, knowledge of psychological harm flowing from another's conduct or even knowledge that the other person's conduct is wrong is not knowledge that the conduct violates the other person's fiduciary obligations. See, e.g., *Palermo* v. *Brennan*, 41 Mass. App. Ct. at 509 ("while the plaintiff may have known, before 1988, that she suffered harm as a result of what she perceived to be an affair with the defendant, it is by no means clear that she believed she had been harmed by the defendant's psychotherapeutic treatment"); *Simmons* v. *United States*, 805 F.2d 1363, 1367 (9th Cir. 1986) (evidence that plaintiff suffered emotional pain and guilt after sexual intercourse with married therapist does not demonstrate understanding that her harm was caused by

---

[8]*Korper* v. *Weinstein*, 57 Mass. App. Ct. 433 (2003), where we held that sexual contact between a physician and a patient was not, as matter of law, a breach of the physician's fiduciary duty to the patient, is not to the contrary. Nothing in the record of that case suggested that the physician undertook to protect, improve, or otherwise professionally deal with the patient's *emotional* health. Where an individual represents himself as a counsellor, and the person counselled reasonably relies upon that representation, the counsellor may have a fiduciary duty "to engage in conduct designed to improve" the counsellee's emotional health. *Destefano* v. *Grabrian*, 763 P.2d 275, 284 (Colo. 1988). See *F.G.* v. *MacDonnell*, 150 N.J. 550, 563-564 (1997) (counsellor's violation of trust is breach of fiduciary duty to counsellee). A breach of that duty occurs if the counsellor uses the position to gain a personal advantage in the form of sexual favors.

therapist's negligence); *Greenberg* v. *McCabe*, 453 F. Supp. 765, 771 (E.D. Pa. 1978) (although plaintiff was aware that sexual relationship with therapist was wrong, jury could reasonably infer plaintiff believed the relationship was morally wrong rather than improper psychiatric care), aff'd, 594 F.2d 854 (3d Cir.), cert. denied, 444 U.S. 840 (1979). See generally *Prendergast* v. *Sexton*, 282 Mass. 21, 24 (1933) (repeated refusals to comply with beneficiary's request for reconveyance of trust property insufficient to start statutory period running because "[t]here was no absolute and unconditional repudiation by the defendant of her promise to reconvey"); *Stuck* v. *Schumm*, 290 Mass. 159, 165 (1935) (where the trust was to continue for an indefinite time and where the defendant was to determine when distributions were to be made or the trust was to terminate, "the statute of limitations is not applicable until and unless the trust is terminated by the defendant by adequate repudiation through speech or conduct," and a mere failure to make distributions did not start the limitations period); *Lattuca* v. *Robsham*, 442 Mass. at 214, quoting from Annot., What Constitutes Sufficient Repudiation of Express Trust by Trustee to Cause Statute of Limitations to Run, 54 A.L.R.2d 13, 25 (1957) ("repudiation does not occur [and the statutory period does not begin to run] if the trustee 'instead of flatly rejecting a demand or request . . . gives some apparently good or plausible reason for his noncompliance, or promises future compliance . . . [which] may well be regarded as being more nearly a recognition of the trust than a repudiation thereof' ").

In the last analysis, trust and confidence are at the center of every fiduciary relationship. Indeed, the relationship typically arises because the beneficiary believes that the fiduciary is more skilled and competent in some area than is the beneficiary herself. That belief, and the trust and confidence the belief produces, frequently induce the beneficiary to follow the fiduciary's lead and guidance even during times of stress, difficulty, and unfavorable results. The entire purpose of the relationship would, therefore, be defeated if the beneficiary were required to second-guess the adequacy of the fiduciary's performance or to commence investigations into the quality of that performance each time a seemingly unfavorable or harmful

result occurred. See *Hendrickson* v. *Sears*, 365 Mass. at 90. See also Frankel, Fiduciary Law, 71 Cal. L. Rev. 795, 809-810 (1983). Even in the face of apparent harm, therefore, the beneficiary is entitled to rely on the fiduciary's obligation to act in her best interests until the beneficiary actually knows that the fiduciary has violated his obligations or the fiduciary expressly and unequivocally communicates to the beneficiary his repudiation or abandonment of those obligations. In this case, there is a genuine issue of material fact whether a fiduciary relationship existed and, if it did, when the plaintiff's knowledge of Freeman's breach of his obligations arose or he clearly and unequivocally made a repudiating communication to her.

Insofar as the plaintiff's claims for negligent breach of fiduciary duty are concerned, the judgment is reversed and the case is remanded to the Superior Court for further proceedings not inconsistent with this opinion. In all other respects, the judgment is affirmed.

*So ordered.*