JANE DOE[1] *vs.* HARBOR SCHOOLS, INC., & another.[2]

Essex. December 5, 2005. - March 14, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Fiduciary. Practice, Civil,* Summary judgment, Statute of limitations. *Incompetent Person,* Statute of limitations. *Limitations, Statute of.*

In a civil action alleging that a male counsellor at the defendant school sexually abused the plaintiff, a former student at the school who suffered from emotional problems, although the plaintiff established that the counsellor's conduct violated his fiduciary duties to her [252-254], her claim for breach of fiduciary duty was untimely, where she was actually aware of the counsellor's wrongful, injurious conduct toward her more than three years before the filing of the complaint [259-261].

This court concluded that the actual knowledge standard governed the tolling of the statute of limitations for a claim for breach of fiduciary duty [254-255], and that the plaintiff must have actual knowledge that she has been injured by the fiduciary's conduct, not knowledge of consequences of that injury, for the cause of action to accrue [255-257]; in circumstances where the plaintiff lacks sufficient mental ability to establish the causative link between the fiduciary's conduct and the plaintiff's injury, however, the cause of action accrues when the plaintiff becomes capable of attaining actual knowledge of injury by the fiduciary's conduct [257-259].

CIVIL ACTION commenced in the Superior Court Department on January 23, 1997.

The case was heard by *Joseph A. Grasso, Jr.,* J., on motions for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Michael D. Riseberg* (*Brian R. Birke* with him) for Harbor Schools, Inc.

*Richard J. Fallon* for the plaintiff.

MARSHALL, C.J. We determine in this case when a cause of action accrues on a claim for breach of fiduciary duty predicated

---

[1]A pseudonym.
[2]Glen Freeman.

on the alleged sexual misconduct of a male counsellor toward a young woman in his care. On January 23, 1997, the plaintiff, Jane Doe, filed a complaint in the Superior Court against her former counsellor, Glen Freeman, and Freeman's former employer, Harbor Schools, Inc. (Harbor),[3] alleging, among other things, that Freeman breached his fiduciary duty to Doe by means of his sexual conduct with her.[4] The alleged misconduct occurred in the spring of 1993, when Doe was eighteen years old. Doe effectively terminated the relationship in November, 1993. The defendants moved for summary judgment on the ground that Doe's claims were brought outside the three-year statute of limitations that governs tort actions. See G. L. c. 260, § 2A.[5] Doe countered that her 1997 complaint was timely under the "discovery rule," because she did not make and reasonably could not have made the causal connection between her emotional problems and Freeman's conduct until the summer of 1994, when she revealed the sexual nature of the relationship to others and for the first time realized that Freeman had abused her. See *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 229 (2002) (under "discovery rule" applicable in tort actions, limitations period does not start running until such time as plaintiff "knows, or reasonably should have known" of causal connec-

---

[3]Also named in the action were the Commonwealth and Concilio Hispano, Inc. (Concilio). The Commonwealth was dismissed as a defendant pursuant to the parties' stipulation on August 12, 1998, and Doe was awarded a default judgment against Concilio.

[4]Doe's complaint alleged counts against Freeman for assault and battery, negligence, and intentional infliction of emotional distress, and against Harbor and others, see note 3, *supra*, for negligent supervision. The complaint did not specifically include a count for breach of fiduciary duty, as Doe's brief to the court states. Her negligence claim merely referred to Freeman's "duty" toward Doe and his breach of that "duty." However, Doe's factual allegations stated that a fiduciary relationship existed between Doe and Freeman. In his answer, Freeman denied the existence of a fiduciary relationship but admitted that, "as part of his job duties with the Harbor Schools, he was required to act in [Doe's] best interests." As did the Superior Court judge and the Appeals Court, we treat Doe's negligence claims as a claim of breach of fiduciary duty.

[5]General Laws c. 260, § 2A, provides: "Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues."

tion between defendant's action and her injury); *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 205-206 (1990) (same).

A judge in the Superior Court allowed the defendants' motions for summary judgment on all claims, concluding that, because Doe knew or should have known by November, 1993, at the latest, that she had been harmed by Freeman's conduct, her suit was untimely. See *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. 378, 383 (1986) ("On an appropriate record, summary judgment may be granted on the question whether a particular statute of limitations has run"). The Appeals Court affirmed the judgment except as to the claim for "negligent breach of fiduciary duty." *Doe* v. *Harbor Schs., Inc.*, 63 Mass. App. Ct. 337, 350 (2005). See note 4, *supra*. The Appeals Court held that the proper standard to apply to that claim was not the discovery rule but the more subjective "actual knowledge standard," which provides that "a cause of action for breach of fiduciary duty does not accrue until the beneficiary has actual knowledge of the fiduciary's breach. Constructive knowledge is insufficient." *Lattuca* v. *Robsham*, 442 Mass. 205, 213 (2004). See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 519 (1997) ("An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G. L. c. 260, § 12").[6] The Appeals Court held a genuine issue of material fact to exist as to (1) whether "a fiduciary relationship existed between Freeman and [Doe] and required Freeman to use his contacts with [Doe] solely to help her, not himself," and (2) when Doe actually knew, "when it came home to her," that Freeman was not just causing her psychological harm but was by his acts breaching the fiduciary duties he had assumed. *Doe* v. *Harbor Schs., Inc.*, *supra* at 348. The case was remanded to the Superior Court for further proceedings. *Id.* 350. We granted the defendants' application for further appellate review, limited to issues concerning the claim for breach of fiduciary duty.

We affirm the decision of the Superior Court judge on the

---

[6]General Laws c. 260, § 12, provides: "If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."

claim for breach of duty, but on different grounds from those articulated by him. See *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993) (appellate court may affirm judgment on grounds different from those advanced by judge below). While we agree with the Appeals Court that the actual knowledge standard should be applied to the claim for breach of fiduciary duty, we differ on two dispositive points. First, we conclude that no question of material fact exists concerning whether Freeman had a fiduciary duty to Doe to refrain from sexual conduct with her; as Doe's counsellor he had such a duty. Second, we hold that the critical event that starts the limitations period running on a claim for breach of fiduciary duty is when the plaintiff first becomes aware of facts giving rise to her injury by the defendant, and not, as the Appeals Court stated, when the plaintiff first understands the causal connection between her injuries and a legally cognizable claim against the defendant. The record in this case, in particular Doe's own deposition testimony, leaves no doubt that Doe knew she was harmed by Freeman's conduct by November, 1993, at the latest. Therefore, as a matter of law her claim for breach of fiduciary duty, filed in January, 1997, was untimely.

1. *Facts.* We summarize the facts in the light most favorable to Doe. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). Jane Doe was born on November 13, 1974, and spent most of her childhood in various temporary residences of relatives and foster parents. Some of Doe's caretakers were sexually or physically abusive to her. In April, 1992, when she was seventeen years of age and in the legal custody of the Department of Social Services (department), Doe was placed in a group residential home for young women transitioning to independence. The group home was operated by Harbor, a nonprofit organization, under the auspices of the department.

On the first day of Doe's placement, Freeman, a supervisor at the home, introduced himself as her "one-on-one counselor."[7] As a "one-on-one counselor," Freeman's assignment was to help Doe learn how to organize her life: making appointments

---

[7]Doe was also assigned a licensed clinical social worker with whom she met regularly for individual therapy sessions.

with health care professionals and to visit relatives, arranging transportation, buying clothing, and the like, according to Doe's needs. The position required no specific training; Freeman had a business degree and was not licensed as a mental health professional.

From the outset of the relationship, Freeman attempted to gain Doe's trust and develop an intimacy with her. Although he initially told Doe that he was supposed to meet with her weekly, he soon began meeting with her two or more times a week. In these meetings, Freeman encouraged Doe to reveal highly personal matters to him, including the details of a past rape. Doe testified at her deposition that Freeman told her: "Because he was my counselor I had to tell him [these] things in order to work on my issues." Further blurring their formal relationship, Freeman confided in Doe that he was unhappy with his marriage and that his wife would not have sexual relations with him.

Freeman showered Doe with special favors. He often took her to dinner outside of the group home, took long drives with her, taught her to drive, and picked her up from school in his automobile.[8] He told her that other staff members did not like her.

By the fall of 1992, around the time Doe turned eighteen years of age, Freeman told Doe that he loved her. He sent her flowers, gave her $2,000 toward the purchase of an automobile, and bought jewelry and other gifts for her. Freeman told Doe not to tell anyone about the gifts or he would "get in trouble." At about this time, he also began massaging her shoulders and back when she was upset. In April or May, 1993, Freeman kissed Doe on the lips for "[a]bout a minute." Doe testified that she felt "uncomfortable with the situation" because Freeman "was my counselor and he was married." She did not tell anyone about the incident because she was afraid that she would not be believed (as she had not been when she had complained of abuse in the past) and that she would be expelled from the home. Toward the end of May, 1993, Freeman managed to be

---

[8]Freeman had dinner with Doe several times in his home, and on at least one of these occasions his wife was present.

alone with Doe behind closed doors in her room. There, he kissed her, and she performed oral sex on him. Less than one month later, at Freeman's house, Doe again performed oral sex on him, and he pulled down her pants and touched her vagina. Doe testified that she was never sexually attracted to Freeman, but that "I loved Glen. I felt that he loved me. . . . I would do anything to please him that he wanted me to do." After the incident at Freeman's house, however, she told him that she just wanted to be friends, and he agreed.

In June, Doe moved out of the group home and into a more independent living situation, also run by Harbor. Although the move ended Freeman's role as her counsellor, he continued to contact her. Several weeks after the move, however, Doe was informed by Maureen Crowley, her Harbor social worker, that she could not see Freeman any more. Crowley also told Doe that Freeman had been instructed to end his relationship with her but had refused to do so. Doe testified that, even though she knew at the time that Freeman "was taking advantage of me," she was distraught at the prospect of losing him because he was "the only person I had." In June, 1993, Doe attempted suicide by consuming a large quantity of medication and by slitting her wrist. While she was hospitalized, Freeman telephoned her almost every day. He blamed her because he had been fired for continuing to see her, and asked her not to reveal the relationship to anyone.

After the suicide attempt, Doe's feelings for Freeman began to change.[9] In July, 1993, she again decided to end their relation-

---

[9]At her deposition, Doe testified as follows in response to questions from her counsel:

Q.: "At some point in time did you realize that your relationship with Glen was a negative thing, a bad thing?"

A.: "Yes."

Q.: "Okay. What point in time was that?"

A.: "Sometime in late '93 we ended the relationship. . . ."

Q.: "Can you pinpoint a time when you stopped loving him?"

A.: " '93. . . . Before the fall, before I decided to leave the program. . . . Yes, that's when I realized that [the relationship with Freeman] wasn't healthy."

Q.: "Did you know in 1993 that if you had continued to see Glen Freeman, that it would not be healthy?"

ship, and Doe began dating "Joseph."[10] Joseph warned Doe that Freeman was "trouble," and that she should stay away from him. Freeman, however, kept contacting Doe and asking to meet with her. In November, 1993, Doe and Freeman met at a Burger King restaurant. Doe told Freeman that she did not want to see him any longer because she no longer liked him and he was causing her emotional problems.[11]

In July, 1994, Doe told Joseph and her roommate about the sexual relationship with Freeman. Doe testified that she first became angry at Freeman and realized that he had taken advantage of her some time after her disclosures to Joseph. On September 14, 1994, Doe began seeing Laurel A. Heyman, a licensed clinical social worker, for emotional problems that included depression and panic disorder. A treatment summary prepared by Heyman in August, 1999, nearly two years after Doe commenced her action against Freeman, stated that although Doe recognized at the time of the sexual acts with Freeman that "it was morally wrong to have sex with a married man and to have sex with [her] counselor," Doe was only able to recognize that the relationship was an abusive one over "the last two years."

Against the factual background just summarized, we now consider whether, as a matter of law, the defendants were entitled to summary judgment on Doe's claim against them for breach of fiduciary duty.

2. *Discussion.* As noted above, in reviving Doe's claim for breach of fiduciary duty, the Appeals Court determined that tri-

---

*A.*: "Yes."

*Q.*: "Why was that?"

*A.*: "Because I ended up in the hospital and all that."

[10]We use the pseudonym adopted by the Appeals Court. *Doe* v. *Harbor Schs., Inc.*, 63 Mass. App. Ct. 337, 340 (2005).

[11]Freeman apparently had some contact with Doe through the fall of 1994, and at some point in 1994 wrote a note to Joseph claiming, among other things, that Doe had acquired immune deficiency disease and that he had reported Joseph and his father to the Internal Revenue Service for nonpayment of taxes. Doe does not appear to base any of her claims on the 1994 interactions.

able issues existed (1) whether Freeman had a fiduciary relationship with Doe, and (2), if so, whether Doe "actually knew" within the limitations period that Freeman had breached his legal obligations to her. *Doe* v. *Harbor Schs., Inc.*, 63 Mass. App. Ct. 337, 348 (2005). We address each issue in turn.

a. *Fiduciary duty.* With full deference to the Appeals Court, we discern no serious dispute concerning Freeman's fiduciary obligations to Doe. A fiduciary duty exists "when one reposes faith, confidence, and trust in another's judgment and advice." *Van Brode Group, Inc.* v. *Bowditch & Dewey*, 36 Mass. App. Ct. 509, 516 (1994), quoting *Fassihi* v. *Sommers, Schwartz, Silver, & Tyler, P.C.*, 107 Mich. App. 509, 515 (1981). Its central tenet is the "duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation." 1 A.W. Scott & W.F. Fratcher, Trusts § 2.4 (4th ed. 1987). See Restatement (Second) of Trusts § 2 comment b (1959) ("A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation"). Although some fiduciary relationships, such as that between guardian and ward, are created by law, others arise from the nature of the parties' interactions. The "circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case." *Warsofsky* v. *Sherman*, 326 Mass. 290, 292 (1950) (and listing examples of fiduciary relationships). See *Patsos* v. *First Albany Corp.*, 433 Mass. 323, 335-336 (2001) (specific circumstances determine whether fiduciary or arm's-length relationship exists between investor and broker).

Where the fiduciary relationship is not one created by law, the existence of the relationship ordinarily is a mixed question of law and fact for which the party asserting the relationship bears the burden. See *Akin* v. *Warner*, 318 Mass. 669, 674 (1945). This general rule, however, does not preclude determination on a motion for summary judgment record that a fiduciary relationship does or does not exist. See, e.g., *Patsos* v. *First*

*Albany Corp., supra* at 331 (summary judgment record establishes triable issue whether investor and securities broker-dealer were in fiduciary relationship); *Davidson* v. *General Motors Corp.*, 57 Mass. App. Ct. 637, 642-643 (2003) (summary judgment record fails to support plaintiffs' claim of fiduciary relationship to defendant).

The undisputed record in this case leaves no doubt concerning the existence of a fiduciary relationship between Freeman and Doe. Freeman was in a formal position of authority over Doe, and responsible, among other things, for her practical education in independent living. Freeman, while denying the existence of a fiduciary relationship, acknowledged in his answer to Doe's complaint that he was required to act in Doe's best interests. See note 4, *supra*. He testified at his deposition that as Doe's "one-on-one counselor," he was required to "gear[] [himself] according to the needs of [Doe]." It is clear that Freeman understood that Doe would repose "faith, confidence, and trust in [his] judgment and advice," *Van Brode Group, Inc.* v. *Bowditch & Dewey, supra* at 516, that she did so, and that he acted accordingly. The nonexistence of a counselling license or of psychological training does not relieve Freeman of the fiducial obligations to which his position and his conduct gave rise. See *Warsofsky* v. *Sherman, supra.*

That Freeman breached his fiduciary obligations to Doe also is apparent. Viewed indulgently toward Doe, see *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991), the record demonstrates that, far from acting with the "utmost good faith," *Akin* v. *Warner, supra*, or highest regard for Doe's best interests, see Restatement (Second) of Trusts, *supra* at § 2 comment b, Freeman indulged in a series of acts that exploited Doe's considerable legal and emotional vulnerabilities.[12] We review the transactions between the fiduciary and the beneficiary with "the closest scrutiny." *Akin* v. *Warner, supra* at 675. Freeman's professional conduct offended the high standards the Commonwealth has a right to expect of those in whose care it places our most fragile residents.

---

[12]In a footnote in their brief, the defendants urge us to ignore an affidavit of

Doe, in short, has established that Freeman's conduct violated his fiduciary duties to her. What remains is the more complicated question when Doe's cause of action against him first accrued for limitations purposes, which we now consider.

b. *Statute of limitations.* The Superior Court judge applied the discovery rule to Doe's claim for breach of fiduciary duty, and held the claim to be outside of the statute of limitations. The Appeals Court, applying the actual knowledge standard, concluded that material issues remained for trial. As we explain below, the Appeals Court applied the correct standard to determine when Doe's cause of action for breach of fiduciary duty began to run, but application of that standard to the facts confirms the motion judge's conclusion that Doe's fiduciary claim fails as a matter of law. We turn first to the standard that must be applied to determine when a plaintiff's claim for breach of fiduciary duty accrues for limitations purposes.

(i) *Standard of inquiry.* Although the statute of limitations in tort actions generally runs for three years following the date of the injury, G. L. c. 260, § 2A, our courts have long held that, in certain circumstances, and in the absence of legislation to the contrary, basic fairness dictates a more flexible approach. See *Riley* v. *Presnell,* 409 Mass. 239, 243 (1991) (where Legislature has not defined when cause of action accrues for limitations purposes, that determination has been left to courts); *Bowen* v. *Eli Lilly & Co.,* 408 Mass. 204, 205-206 (1990) (courts have developed "discovery rule" to mitigate rigidity of statute of limitations in cases where plaintiff could not have discovered her injuries in timely manner). For the tort of breach of fiduciary duty, we toll the statute of limitations until a plaintiff has "actual knowledge" that she has been injured by the fiduciary's conduct. See, e.g., *Lattuca* v. *Robsham,* 442 Mass. 205, 213 (2004) ("We consistently have held that a cause of action for breach of fiduciary duty does not arise until the beneficiary is aware that repudiation has occurred"); *Demoulas* v. *Demoulas Super Mkts.,*

Heyman, Doe's therapist, because it conflicts with Doe's deposition testimony and because Doe has failed to qualify Heyman as an expert. We need not consider these perfunctory arguments, see *Kelley* v. *Neilson,* 433 Mass. 706, 713-714 n.14 (2001), which do not alter the result we reach today.

*Inc.*, 424 Mass. 501, 520-521 (1997) (actual knowledge standard applies to plaintiff who argues that breach of fiduciary duty of disclosure constitutes fraudulent concealment). See also *Akin* v. *Warner*, 318 Mass. 669, 676 (1945) ("Delay which might otherwise be found to be unreasonable does not constitute laches so long as there has been no repudiation of the trust with knowledge of the beneficiary"). Mere suspicion or mere knowledge that the fiduciary has acted improperly does not amount to actual knowledge that the plaintiff has suffered harm. See, e.g., *Lattuca* v. *Robsham*, *supra* at 214 (defendant fiduciary's statement that he did not have funds to repay trust amounts he took for his personal use "was not a definitive expression of an intention to repudiate" for purpose of determining plaintiff's actual knowledge of repudiation); *Demoulas* v. *Demoulas Super Mkts., Inc.*, *supra* at 522 (actual knowledge does not derive from plaintiff's receipt of certain documents where plaintiff and his family had not read documents because of express trust they placed in defendant fiduciaries, and where documents not adequately explained nor copies furnished); *Akin* v. *Warner*, *supra* at 675 (fiduciary's demand that beneficiary sign purported release of claims against fiduciary not sufficient evidence of beneficiary's actual knowledge that fiduciary has harmed her). Only when the beneficiary's harm at the fiduciary's hands has "come home" to the beneficiary, *id.*, does the limitations clock begin to run. In this manner, the actual knowledge standard recognizes the dependent status of the beneficiary vis-à-vis the fiduciary, and protects the beneficiary's legitimate expectation that the fiduciary will act with the utmost probity in all matters concerning the relationship.

Having clarified that the actual knowledge standard governs Doe's claim for breach of fiduciary duty, we now consider what the beneficiary must "actually know" to start the limitations clock running.

(ii) *Triggering events.* We reject Doe's contention that her fiduciary claim does not accrue until she first understood that she had been legally harmed, i.e., that she could sue Freeman for her injuries. See *Doe* v. *Harbor Schs., Inc.*, 63 Mass. App.

Ct. 337, 348-349 (2005). While strong public policy favors protecting the beneficiaries of a fiduciary relationship, see *Akin* v. *Warner, supra,* equally strong public policy favors imposing reasonable limits on liability. Statutes of limitations provide the temporal finality necessary for the orderly conduct of human affairs. See *Franklin* v. *Albert,* 381 Mass. 611, 618 (1980), quoting *Wood* v. *Carpenter,* 101 U.S. 135, 139 (1879) (statutes of limitations give "security and stability to human affairs"). They represent society's considered, although often far from perfect, compromise between a plaintiff's need to remediate wrongs and society's need for closure and forward movement. By permitting beneficiaries to bank causes of action until such time as the beneficiary attains a lawyer's knowledge of fiduciary obligations, Doe's theory would skew the limitations balance decidedly in favor of plaintiffs. Fiduciaries would become perpetual defendants-in-waiting, and one would expect as a result that fewer individuals would elect to undertake a fiduciary's weighty responsibilities.

Our prior decisions do not compel such a result. We have held that a cause of action accrues for limitations purposes when a plaintiff knows (or in the case of the discovery rule, should know) facts sufficient to make a causative link between the fiduciary's conduct and the beneficiary's actual injury. See, e.g., *Bowen* v. *Eli Lilly & Co., supra* at 205-206 (discovery rule "prescribes as crucial the date when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct"); *Stuck* v. *Schumm,* 290 Mass. 159, 165 (1935) ("the statute of limitations is not applicable until and unless the trust is terminated by the defendant by adequate repudiation through speech or conduct"); *Sheila S.* v. *Commonwealth,* 57 Mass. App. Ct. 423, 428 (2003), quoting *Krasnow* v. *Allen,* 29 Mass. App. Ct. 562, 568-569 (1990) ("Massachusetts does not require discovery of each of the elements of the cause of action — duty, breach, causation, and damages before the limitation clock . . . starts ticking").[13] Actual knowledge of injury suffered at a fiduciary's hands, not

---

[13]Once she attains an understanding of the link between the defendant's ac-

knowledge of the consequences of that injury (i.e., a legal claim against the fiduciary), sets the three-year statute of limitations in play.

(iii) *Actual knowledge.* Whether the fiduciary breaches her trust by fraudulent misrepresentation, see *Demoulas* v. *Demoulas Super Mkts., Inc., supra,* or by repudiating the trust, see *Lattuca* v. *Robsham, supra* at 214,[14] in most cases the date on which the plaintiff acquires the requisite knowledge will be readily ascertainable as a matter of fact. See, e.g., *id.* at 214-215 (fiduciary's wrongful appropriation of trust property evident when beneficiary learns results of title search). In some circumstances, however, the beneficiary may lack sufficient mental ability to establish the causative link between the fiduciary's conduct and the beneficiary's injury, even when the beneficiary is aware of facts that would otherwise constitute "actual knowledge." See *Riley* v. *Presnell,* 409 Mass. 239, 246 (1991) ("An injury to the mind could interfere with the

tions and harm to herself, the beneficiary, as a reasonable person, has "the duty to discover from the legal, scientific, and medical communities" whether she has a cognizable legal claim. *Malapanis* v. *Shirazi,* 21 Mass. App. Ct. 378, 384 (1986), quoting *Fidler* v. *Eastman Kodak Co.,* 714 F.2d 192, 199 (1st Cir. 1983) (applying discovery rule).

For example, a beneficiary is entitled to approach without skepticism a fiduciary's representation that the fiduciary is investing the beneficiary's money on the beneficiary's behalf and is not required to ascertain the absence of foul play. However, once the beneficiary learns that the money has never been invested, he is required to act reasonably to ascertain whether, as a beneficiary, he has been harmed. See *Stetson* v. *French,* 321 Mass. 195, 198-199 (1947); *Akin* v. *Warner,* 318 Mass. 669, 675 (1945).

[14]There are two distinct types of breach of duty a fiduciary may commit. The first is fraudulent concealment, and the second is repudiation of the trust, both of which we recently explained in some detail. See *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 517-521 (1997). The plaintiff has alleged here that Freeman has committed both types of breach, although her complaint suggests reliance solely on a repudiation claim. The Appeals Court considered only the repudiation doctrine. See *Doe* v. *Harbor Schs., Inc.,* 63 Mass. App. Ct. 337, 345-346 (2005). We have recognized that a breach of fiduciary duty may partake of both kinds of wrongful conduct — concealment and repudiation — and that the actual knowledge standard applies to both to toll the statute of limitations. *Demoulas* v. *Demoulas Super Mkts., Inc., supra* at 517-519. See, e.g., *Lattuca* v. *Robsham,* 442 Mass. 205, 213 (2004) (applying actual knowledge standard to repudiation claim); *Demoulas* v. *Demoulas Super Mkts., Inc., supra* at 520-521 (applying actual knowledge standard to fraudulent concealment claim).

discovery of the cause of action"). In such cases, the question when the plaintiff *attained* actual knowledge becomes a question when the plaintiff became *capable of attaining* such knowledge. Expert testimony often will be invoked to explain (or refute) the nature, cause, and duration of the plaintiff's incapacity, and a genuine issue of material fact may exist concerning the reasonableness of the plaintiff's claims of impairment. See *id.* at 246-247.

In *Riley* v. *Presnell, supra*, for example, the plaintiff initiated a malpractice suit in 1985 against his psychotherapist for treatment that took place from 1975 through 1980. During that treatment, the defendant had sexual relations with the plaintiff, introduced drugs and alcohol into the therapy sessions, and told the plaintiff that the treatment was "special" and should not be revealed to others. *Id.* at 241. In 1981, the plaintiff was told by a subsequent psychotherapist that the defendant's conduct had been "substandard, bad, and essentially 'nontreatment,' " as well as "totally inappropriate." *Id.* at 241-242.

When the defendant sought to interpose the three-year statute of limitations, the plaintiff claimed his case was timely because he did not learn of the connection between his current emotional problems and the defendant's treatment until 1984, when he met a former patient of the defendant who had been similarly abused. *Id.* at 242. We noted that the psychotherapist-patient relationship had "fiduciary aspects" and concluded that on the record before us, a material issue of fact remained "as to when the plaintiff knew or should have known that he may have been harmed by the defendant's wrongful conduct." *Id.* at 250, 251.

The *Riley* case does not, as the defendants claim, establish that the discovery rule rather than the actual knowledge standard applies to Doe's claim for breach of fiduciary duty. There, an open question remained whether Riley's substance addiction and other emotional problems, some of which allegedly had been caused by the defendant, impaired his actual knowledge of the connection between the defendant's conduct and Riley's own harm. *Id.* at 244-245. See *Ross* v. *Garabedian*, 433 Mass. 360, 366 (2001) (in claim of childhood sexual abuse pursuant to G. L. c. 260, § 4C, material issue of fact existed as to when plaintiff was capable of making causal connection between

sexual abuse by defendant and plaintiff's injuries where plaintiff's ability to make connection may have been affected by his youth and childhood experiences, as well as his "psychological coping mechanisms"). In light of the factual controversy concerning Riley's ability to become aware that the defendant had harmed him, we concluded that where a plaintiff puts his mental status at issue in an attempt to defeat the statute of limitations, the trier of fact, or a judge on a motion for summary judgment, is required to consider whether the claimed impairment is reasonable in all the circumstances. *Riley* v. *Presnell, supra* at 245 ("If . . . an initially reasonable person would, by reason of the experience forming the basis for the plaintiff's complaint, have his or her judgment altered in some way, such altered judgment then becomes the standard.[15] The cause of action will not accrue until such an individual *would have discovered* the damage" [emphasis added]). To hold otherwise and permit plaintiffs to identify their own moment of clarity without challenge would be to encourage frivolous claims of lack of capacity, in contravention of public policy. However, where a plaintiff does not assert that he was incapable of understanding the link between the fiduciary's actions and his own injury, the question remains *when* the plaintiff first learned of the causal connection, and a "reasonableness" standard does not apply. See *Lattuca* v. *Robsham*, 442 Mass. 205, 213-215 (2004).

We now turn to the merits of Doe's claim that the statute of limitations on her claim for breach of fiduciary duty did not begin to run until late in 1994.

3. *Merits.* We are unconvinced by Doe's attempt to cast the record in the factual mold of the *Riley* case.[16] Specifically, Doe asserts that although she knew in the summer of 1993 that the

---

[15]We also reject the defendants' contention that the actual knowledge standard applies only to claims for fraudulent concealment and repudiation of trust in the case of monetary fiduciary relationships. In *Riley* v. *Presnell*, 409 Mass. 239 (1991), for example, we addressed a breach of fiduciary duty claim centered on a therapeutic relationship. As we stated above, the actual knowledge standard accommodates the beneficiary's relative powerlessness and expectation of good faith in the relationship, aspects that form the core of any such relation. See G. L. c. 260, § 12 (not limiting claims of fraudulent concealment to monetary torts).

[16]Doe claims that she was a victim of Freeman's manipulation of the

sexual relationship with Freeman was morally wrong and emotionally damaging to her, she did not recognize that Freeman's conduct caused her *"legal harm . . .* at least until the middle of 1994, when she . . . could begin to escape from his counselor's psychological spell by telling another of her sexual activity with Freeman" (emphasis added). See *Riley* v. *Presnell, supra* at 245 (discussing plaintiff's claim of "altered judgment"). First, as we stated above, knowledge of legal harm is not the correct measure of the event that will trigger the start of the limitations period. Second, Doe's claim that knowledge of a causal link between her emotional problems and Freeman's conduct did not occur until 1994 does not withstand scrutiny. The record is devoid of any evidence that Freeman, who was not a therapist, knew of, let alone systematically misapplied, "transference" or any other psychotherapeutic treatment method in his relationship with Doe. See note 16, *supra*. Cf. *Riley* v. *Presnell, supra* at 246. Nor is there any evidence that Freeman attempted to convince Doe that the sexual relationship was an appropriate aspect of the counselling relationship, rather than an outgrowth of friendship. Cf. *id.* at 241-242.

Especially damning to Doe's claim for breach of fiduciary duty is her own deposition testimony. It is replete with specific evidence that she knew she was harmed by Freeman well before January 23, 1994, the outermost date for the timely filing of her complaint. See *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 211

phenomenon of "transference," a phenomenon "crucial to the therapeutic process" where the patient "unconsciously attributes to the psychiatrist or analyst those feelings which he may have repressed towards his own parents. . . . [I]t is through the creation, experiencing and resolution of these feelings that [the patient] becomes well." *Simmons* v. *United States*, 805 F.2d 1363, 1365 (9th Cir. 1986), quoting *L.L.* v. *Medical Protective Co.*, 122 Wis.2d 455, 461 (Ct. App. 1984). See *Palermo* v. *Brennan*, 41 Mass. App. Ct. 503, 509 (1996), citing *Simmons* v. *United States, supra* at 1367. But see *Lopez* v. *United States*, 998 F. Supp. 1239, 1245 n.3 (D.N.M. 1998) (rejecting notion that phenomenon of transference "necessarily sets the psychotherapist apart from other professionals who also engage in relationships based on trust"). She urges this court to establish that the actual knowledge standard "provides more protection to the sexually abused psychotherapy client/patient than a simple fiduciary actual knowledge rule alone." We decline Doe's invitation to depart from a careful, case-by-case analysis of factual circumstances in cases where a fiduciary relationship is established as a matter of law. See *Akin* v. *Warner*, 318 Mass. 669, 674-675 (1945).

(1990) (summary judgment on limitations grounds appropriate where no material fact existed as to when plaintiff had actual or constructive knowledge of tort). Doe testified that she knew when she had sexual contact with Freeman that his conduct was wrong because he was her counsellor. She testified that shortly after her suicide attempt in June, 1993, and before the fall of 1993, she had decided to terminate the relationship with Freeman because she "realized that it wasn't healthy." She also understood after the suicide attempt that Freeman had taken advantage of her. Doe testified that, at some time during the summer of 1993, she was told by her boy friend that Freeman was "trouble" and that the relationship was "unhealthy." And in the fall of 1993, Doe was aware that Freeman was causing her emotional harm. It is difficult to draw any conclusion from this record other than that, by the fall of 1993, Doe realized that Freeman had abused his position and that she was harmed by his conduct. Her actual knowledge then triggered a duty to investigate further and started the limitations period running. See note 13, *supra*.

Doe correctly points out that elsewhere in her deposition testimony she claims that she did not realize Freeman's conduct had harmed her until July, 1994, when she revealed the sexual nature of the relationship to her boy friend, Joseph. Her assertion is buttressed by the four-paragraph "treatment summary" submitted by her therapist at the summary judgment stage. In the context of the entire record, however, these statements lack the detail and force of Doe's self-defeating testimony elsewhere, as the judge concluded. See *O'Brien* v. *Analog Devices, Inc.*, 34 Mass. App. Ct. 905, 906 (1993) (plaintiff cannot use her own conflicting deposition testimony to create material issue of fact to surmount summary judgment).

Because the record before us establishes, primarily in Doe's own words, that she was actually aware of Freeman's wrongful, injurious conduct toward her by November, 1993, at the latest, her claim for breach of fiduciary duty, filed in January, 1997, was untimely, and the motion judge correctly entered summary judgment for the defendants on that count.

4. *Conclusion.* For the reasons stated above, we affirm the Superior Court judge's entry of summary judgment for the defendants.

*So ordered.*