van Gestel, Allan, J.
This matter is before the Court on Defendants’ Joint Motion for Summary Judgment on Statute of Limitations Grounds, Paper #31.
The Amended Complaint, in major part, focuses on two transactions that took place many years ago. It is claimed that each of Sumner M. Redstone (“Sumner”) and his brother, Edward S. Redstone (“Edward”), breached fiduciary duties purportedly owed to Edward’s children in connection with certain stock redemptions in National Amusements, Inc. (“NAI”) that occurred in 1972 and 1984. The Amended Complaint alleges that the plaintiffs here, who are trustees of certain Redstone family trusts and Michael David Redstone, Edward’s son, only recently became aware of their causes of action.
Sumner, Edward and NAI rely for the present motion on the three-year statute of limitations found in G.L.c. 260, sec. 2A.

BACKGROUND

The facts that follow are not in dispute.
The original Complaint in this case was filed on November 3, 2006. The two transactions that form the basis for the complaint occurred on June 30, 1972 and March 8, 1984.
NAI was formed in August 1959. When it was formed, it issued 300 shares of class A common stock. One hundred shares were registered in the name of Michael Redstone (“Mickey”), the father of Sumner and Edward, 100 were registered in the name of Sumner, and 100 were registered in the name of Edward. Before 1968, NAI purchased back 50 of the 100 shares registered in Mickey’s name.
On May 6, 1968, Mickey created the Grandchildren’s Trust for the benefit of his four grandchildren, Edward’s children, Ruth Ann and Michael, and Sumner’s children, Brent and Shari. Mickey funded the Grandchildren’s Trust with his 50 remaining shares of NAI.
For a while, Mickey, Sumner and Edward all were involved in running NAI. Disagreements arose, however, between Sumner and Edward over the operations and future direction of NAI. In June 1971, Edward left NAI. He demanded, but did not receive, possession of the 100 shares of NAI registered in his name.
Edward retained Boston attorney James R. DeG-iacomo (“Mr. DeGiacomo”) to assist him in resolving the dispute with Sumner and Mickey, including obtaining possession of his 100 shares of NAI. This representation resulted in the filing by Mr. DeG-iacomo, on behalf of Edward, of two suits in the Suffolk Superior Court in December 1971. On June 30, 1972, the parties executed a settlement agreement to resolve the family dispute (the “1972 Settlement Agreement”).
Under the terms of the 1972 Settlement Agreement, Edward agreed that he would sever all ties with the Redstone family companies, including NAI, as well as with the Redstone family trusts. He further agreed that he would sell 66 and 2/3 of the 100 shares of NAI registered in his name to NAI for $5,000,000. In addition, Edward agreed that the remaining 33 and 1 /3 shares of NAI would to be held in trust for the benefit of Ruth Ann and Michael, his children, under two written trusts. Following the execution of the trust documents, Sumner initially was to serve as trustee.
Mr. DeGiacomo signed the 1972 Settlement Agreement as a witness. He also negotiated the declarations of trust and, along with a partner, witnessed and notarized the declarations establishing the trusts for the benefit of Michael and Ruth Ann.
NAI and Edward then entered into a redemption agreement pursuant to which NAI purchased from Edward his 66 and 2/3 shares for $5 million (the “1972 Redemption Agreement”). Edward also executed a release discharging all claims by him and his children against NAI, Sumner and Mickey. Mr. DeGiacomo also negotiated the 1972 Redemption Agreement on Edward’s behalf and signed it as a witness.
Shortly after the 1972 Redemption, Mr. DeGiacomo met with Ruth Ann and explained to her the terms of the Ruth Ann Trust, “how it came about and what her interest would be.” Mr. DeGiacomo explained that there was a “dispute over the ownership of the shares,” and that a portion of these shares were placed in trust *668 for the benefit of her and her brother, Michael. Mr. DeGiacomo also discussed Edward’s lawsuit against Sumner and Mickey with Ruth Ann, who was already aware of it.
In 1982, Sumner began exploring the possibility of NAI redeeming the shares held in the Ruth Ann (16 and 2/3 shares), Michael (16 and 2/3 shares), and the Grandchildren’s Trusts (50 shares, 12 and 1/2 for each grandchild).
On December 16, 1982, pursuant to Article 7(c) of the Ruth Ann and Michael Trusts, Sumner selected Mr. DeGiacomo “as independent counsel to represent the interests of the beneficiaries” of the Trusts. Mr. DeGiacomo has testified that Sumner selected him because he believed that he “would be fair, reasonable and somebody who would not be swayed.” Mr. DeG-iacomo viewed himself as an unofficial guardian ad litem to the beneficiaries whose purpose was to determine the fair value of the shares to be redeemed, and whether such redemption was in the best interests of Ruth Ann and Michael.
Samuel Rosen (“Rosen”), a certified public accountant, was engaged by Sumner to prepare a report appraising the fair market value of the 58 and 1/3 shares held in trusts for the benefit of Ruth Ann and Michael. Rosen issued a 30-page report, dated January 3, 1983, in which he concluded that the fair market value of 58 and 1/3 shares of NAI stock was $7,515 million. After the NAI financial results for 1982 were in, Rosen increased his valuation figure to $9,868 million. Mr. DeGiacomo was given copies of Rosen’s valuations.
Mr. DeGiacomo then engaged Samuel D. Daume (“Daume”) of Citibank to review and analyze Rosen’s materials on behalf of the beneficiaries of the trusts and to provide Mr. DeGiacomo with “expert advice” as to the reasonableness of Rosen’s valuation. Daume was a Vice President, Senior Credit Officer, at Citibank’s Private Bank, where he worked from 1962 until January 27, 1984. Daume was responsible for approving loans to high-net-worth individuals who were backed principally by private companies. He had the “highest lending authority at Citibank.” Daume was an expert in the area of private company valuation, having had 22 years of experience by 1984, 10 of which was spent valuing private companies.
Mr. DeGiacomo also sought advice from Edward and, together with Edward and Daume, from three other individuals at Citibank.
Each of the four Citibank representatives advised Mr. DeGiacomo that they disagreed with Rosen’s valuation. They were concerned that NAI’s real estate holdings, which were important to its theater operations, were not included as part of the going concern value of NAI.
In light of the Citibank response, Mr. DeGiacomo invoked the arbitration provision of Article 7(b) of the Ruth Ann and Michael Trusts to determine the fair market value of the shares. Matters became quite contentious between Sumner, on the one hand, and Mr. DeGiacomo on the other. Ultimately, however, agreement was reached on a valuation of $15 million. Daume, who had remained in the process, advised Mr. DeGiacomo that $15 million was fair.
Accordingly, on March 8, 1984, NAI purchased the 58 and 1 /3 shares held in the trusts for the benefit of Ruth Ann and Michael for $15 million, $5.132 million more than the revised Rosen valuation.
NAI also purchased the 25 shares held in the Grandchildren’s Trust for the benefit of Brent and Shari for $6,428,571.43.
Mr. DeGiacomo, as independent counsel to the beneficiaries of the Ruth Ann and Michael Trusts, executed the 1984 Redemption Agreement.
Michael (then age 27 and bound for business school), Brent (then 34 and a Suffolk County Assistant DA), and Shari (then 30 and an attorney) explicitly swore — in writing and before a Notaiy Public — that they “urged... approve(d) and endorse(d) the redemption and purchase by [NAI] of the [stock of NAI held in trust by the Michael Trust and the Grandchildren’s Trust] at the price and in accordance with the terms and conditions of the redemption agreement of even date [the 1984 Redemption Agreement].”
The plaintiffs here claim that they only learned of Sumner’s and Edward’s alleged self dealing and breaches of duties in 2004 when, in a probate suit filed by Edward, the 1972 Settlement Agreement, the 1984 Redemption Agreement, and the reports of valuation by Rosen were produced.

DISCUSSION

Rule 56(c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 824 (1974), provides that summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” We view the evidence in the light most favorable to the nonmov-ing party. See BayBank v. Bornhofft, 427 Mass. 571, 573 (1998).
Vittands v. Sudduth, 49 Mass.App.Ct. 401, 405-06 (2000).
Thus, summary judgment is granted where, viewing the evidence in the light most favorable to the non-moving party, there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Cabot Corporation v. AVX Corporation, 448 Mass. 629, 636-37 (2007); Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); *669 Mass.R.Civ.P. 56(c). “[T]he moving party must establish that there are no genuine issues of material fact, and that the non-moving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
Here, however, the defendants’ motion is grounded solely on the statute of limitations. It is G.L.c. 260, sec. 2A, a three-year limitations period, that governs this case. Thus, “[o]nce the defendant pleads the statute of limitations as a defense . . . and establishes that the action was brought more than three years from the date of the injury, the burden of proving facts that take the case outside the impact of the statute falls to the plaintiff.” Riley v. Presnell, 409 Mass. 239, 243-44 (1991). See also Franklin v. Albert, 381 Mass. 611, 619 (1980); Friedman v. Jablonski, 371 Mass. 482, 487 (1976).
Here, the two events upon which the plaintiffs’ action are grounded occurred in 1972 and 1984, vastly more than three years before this case was filed on November 3, 2006.
Both plaintiffs and defendants point to the same case in principal support of their respective positions. That case is Lattuca v. Robsham, 442 Mass. 205 (2004). This Court, therefore, will first discuss the law in Lattuca, and in another case that follows in its wake, that applies, in part at least, to the situation here.
Lattuca involved litigation between and among trustees and beneficiaries of a realty trust. There were claims of breach of the covenant of good faith and fair dealing, breach of fiduciary duly, and violation of G.L.c. 93A. After a jury-waived trial, a Superior Court Justice found breaches of the covenant of good faith and fair dealing and of fiduciary duties, but found no violation of G.L.c. 93A. Both the Appeals Court, under its Rule 1:28, and the SJC affirmed the judgment of the Superior Court.
Among other things, in Lattuca there was a statute of limitations issue similar to that here. The defendants in Lattuca, like the defendants here, argued that the claim for breach of fiduciary duty was barred by the three-year statute of limitation found in G.L.c. 260, sec. 2A. The Lattuca court, at p. 213, said, in material part:
Breach of fiduciary duty is a cause of action in tort that is governed by G.L.c. 260, sec. 2A, which provides for a three-year period of limitation. We have said that when an action is brought against a trustee, the “cause of action does not accrue until the trustee repudiates the trust and the beneficiary has actual knowledge of that repudiation.” . . . Therefore ... a cause of action for breach of fiduciary duty does not accrue until the beneficiary has actual knowledge of the fiduciary’s breach. Constructive knowledge is insufficient.
We consistently have held that a cause of action for breach of fiduciary duty does not arise until the beneficiary is aware that repudiation has occurred . . . We focus on what the plaintiff beneficiary actually knew, not what the trustee actually or constructively knew.
In the more recent case Doe v. Harbor Schools, Inc., 446 Mass. 245, 255 (2006), the SJC explained: “the actual knowledge standard recognizes the dependent status of the beneficiary vis-a-vis the fiduciary, and protects the beneficiary’s legitimate expectation that the fiduciary will act with the utmost probity in all matters concerning the relationship.” Also in Doe the SJC said, “we hold that the critical event that starts the limitations period running on a claim for breach of fiduciary duly is when the plaintiff first became aware of facts giving rise to her injury by the defendant, and not, as the Appeals Court stated, when the plaintiff first understands the causal connection between her injuries and a legally cognizable claim against the defendant.” Id. at 248.
Doe emphasized that “[o]nly when the beneficiary’s harm at the fiduciary’s hands has ‘come home’ to the beneficiary . . . does the limitations clock begin to run.” Id. at 255. At the same time, the Doe court made clear that the beneficiary’s cause of action is not dependent on knowledge of being “legally harmed, i.e., that she could sue [the trustee] for her injuries.” Id.
The Doe court then recited the purpose for the public policy favoring protecting beneficiaries and measured it against the equally strong public policy favoring limits on liability. At pp. 256-57 the court said:
While strong public policy favors protecting the beneficiaries of a fiduciary relationship . . . equally strong public policy favors imposing reasonable limits on liability. Statutes of limitations provide the temporal finality necessary for the orderly conduct of human affairs . . . They represent society’s considered, although often far from perfect, compromise between a plaintiffs need to remediate wrongs and society’s need for closure and forward movement. By permitting beneficiaries to bank causes of action until such time as the beneficiary obtains a lawyer’s knowledge of fiduciary obligations . . . would skew the balance decidedly in favor of plaintiffs. Fiduciaries would become perpetual defendants-in-waiting, and one would expect as a result that fewer individuals would elect to undertake a fiduciary’s weighty responsibilities.
Our prior decisions do not compel such a result. We have held that a cause of action accrues for limitations purposes when a plaintiff knows . . . facts sufficient to make a causative link between the fiduciary’s conduct and the beneficiary’s actual injury . . . Actual knowledge of injury suffered at a fiduciary’s hands, not knowledge of the consequences of that injury (i.e., a legal claim against the *670 fiduciary), sets the three-year statute of limitations in play.
The Court must now examine the summary judgment record to determine the state of the actual knowledge of Michael David Redstone that he suffered injury at Sumner’s and Edward’s hands, but not his knowledge of the consequence of that injury, legal claims against Sumner and Edward.
The Court begins with the Amended Complaint which states what it is that the plaintiffs seek. Claiming breaches of fiduciary duties, breaches of duties of loyalty, self-dealing and unjust enrichment as trustees of certain Redstone family trusts, Amended Complaint, para. 1, the plaintiffs “seek rescission of the redemption transactions with National Amusements, Inc. and reconveyance of the redeemed shares, or money damages in an amount equal to the present value of those shares, and the disgorgement of all profits realized by Sumner M. Redstone and Edward S. Redstone as a result of the redemptions.” Amended Complaint, para. 2. The redemptions, of course are the 1972 and 1984 transactions discussed above and they occurred 32 and 22 years before this suit was filed.
At the time of the 1972 redemption Michael was 15 years old and at the time of the 1984 redemption he was 27, a college graduate and about to commence an MBA program at Bentley College.
What Michael complains about, essentially, is that the two redemptions were for prices that were favorable to Sumner and Edward and, therefore, were inconsistent with their fiduciary duties to Michael.
Although the Amended Complaint, which is not verified, alleges that Sumner’s and Edward’s self-dealing and breaches of duties “were first revealed when documents concerning the redemptions were produced in discovery in connection with a lawsuit that had been filed by Edward in Middlesex Probate Court in 2004,” Amended Complaint para. 12, there is ample evidence in the summary judgment record that Michael was aware of the 1984 redemption both before and at the time it was occurring. This evidence is included in at least the following exhibits contained in the Affirmation of Jeffrey S. Follett, Paper #32: Exhibit 20, a January 29, 1983 letter to Sumner from Michael; Exhibit 21, a 1/10/84 letter to Sumner from Michael; Exhibit 22, a 2/6/84 letter to Sumner from Michael; Exhibit 26, a February 7, 1984 letter to Edward and Mr. DeGiacomo from Rosen, with a copy to Michael; Exhibit 35, a July 22, 1983 letter from Sumner to Mr. DeGiacomo, with a copy to Michael; Exhibit 37, an August 12, 1983 letter from Sumner to Mr. DeG-iacomo, with a copy to Michael; Exhibit 38, an October 19, 1983 letter from Sumner to Mr. DeGiacomo, with a copy to Michael; and Exhibit 43, a March 8, 1984 notarized acknowledgment, approval and endorsement of the redemption signed by Michael, Shari and Brent Redstone.
In this instance, Michael had actual knowledge of the existence of the 1984 redemption long before the 2004 litigation by Edward in the Middlesex Probate Court. The trust repudiations occurred when the redemptions occurred. It was then that the harm to the beneficiaries came home. It is not necessary that Michael knew the extent, i.e., the amount, of his injury or that Sumner’s or Edward’s actions were in breach of their duties which could be sued upon, for the cause of action he now brings to have accrued. See, e.g., Williams v. Ely, 423 Mass. 467, 473-74 (1996).
The Court observes that of the plaintiffs only Michael is a beneficiary. As such he would appear only to have equitable rights to proceed against current trustees. The other plaintiffs, Thomas N. O’Connor (“O’Connor”) and Patricia Gatto (“Gatto”), are the current trustees of the Grandchildren’s Trust, the Ruth Ann Redstone Trust and the Michael David Redstone Trust. Amended Complaint, paras. 3 and 4. They are the ones who, in their trustee capacities, can bring suit against prior fiduciaries or third parties.
Here, however, there can be no question that Mr. DeGiacomo, who was O’Connor’s and Gatto’s predecessor trustee, had ample direct knowledge of the 1972 and 1984 transactions at the time of their execution to have brought suit against Sumner and-Edward for any breaches of their fiduciary duties involving the 1972 and 1984 redemptions many years ago. This knowledge is binding at least on O’Connor and Gatto as successor trustees and, it would seem, on Michael as well.
The three-year limitations period would seem to begin to run against a trust and its beneficiaries when knowledge is gained by a prior trustee not involved in a predecessor’s malfeasance. By analogy, “when a corporation is the injured party in a shareholder derivative suit, the repudiation of trust . . . doctrine[ ] prevents the statute of limitations from running until knowledge is gained by those who have the power and responsibility to act on the corporation’s behalf and who are not themselves involved in the wrongdoing that is the basis for the cause of action.” Demoulas v. Demoulas, 424 Mass. 501, 523 (1997). Thus, if Mr. DeGiacomo, a successor trustee to Sumner, with extensive knowledge of the 1972 and 1984 redemptions, failed to bring a timely claim, the appointment of yet other successor trustees decades later does not result in the commencement of a new limitations period. See, e.g., In the Matter of Superior Toy & Mfg. Co., Inc., 78 F.3d 1169, 1174-176 (7th Cir. 1996) wherein, when dealing with a bankruptcy trustee, the court said, “nor may a subsequent trustee pursue one course, when her predecessor has pursued another.” See also Schofield v. Cleveland Trust Co., 78 N.E.2d 167, 171 (Ohio 1948) (“[A]n action barred by a statute of limitations against a trustee who is vested with the legal title to the trust property and while so vested had the power *671 to sue is likewise barred against a successor trustee or the beneficiaries”).
At least O’Connor’s and Gatto’s arrival on the scene as trustees in 2006 cannot have the effect of resurrecting any statute of limitations that by then had long since expired. C.J.S. Trusts sec. 341; Restatement (Second) of Trusts, sec. 327; Scott on Trusts, sec. 327.2.
Michael and the current trustees have not demonstrated facts that take this case outside the impact of the three-year statute of limitations. The original Complaint arrived more than two decades too late.

ORDER

For the foregoing reasons, the Defendants’ Joint Motion for Summary Judgment on Statute of Limitations Grounds, Paper #31, is ALLOWED, and a final judgment dismissing the Amended Complaint shall enter accordingly.