The plaintiff, Jane F. MacDonald, appeals from a Superior Court judgment that denied her motion for discovery, allowed the defendants' motion to dismiss or, in the alternative, for summary judgment,[4] and dismissed the plaintiff's complaint. We affirm.
Background. 1. Procedural history. We detail the procedural history relevant to the issues before us. The defendants filed a motion to dismiss. In response, the motion judge issued an order which stated that in light of the defendants' reliance on publicly available documents filed with the Securities and Exchange Commission, he had decided to "consider the portion of the [defendants'] motion to dismiss that is based on the applicable statute of limitations as, in the alternative, seeking summary judgment." As a result, the judge allowed the parties to submit additional admissible evidence relevant to the statute of limitations issue. The order also stated that the plaintiff was entitled to "make a properly supported request under Mass. R. Civ. P. 56(f) for the opportunity to conduct discovery on the statute of limitations issues," and that "[i]f she were to make such a request, [she] would have to demonstrate that ... she can make a 'threshold showing' that there is 'some factual basis' for her allegation that [her husband,] Geoffrey MacDonald,[5 ] had no actual knowledge of the challenged business transactions."
The judge granted summary judgment to the defendants on the plaintiff's claims arising from the challenged business transactions, concluding that those claims are time barred because the plaintiff failed to raise a triable issue of fact concerning MacDonald's actual knowledge by January, 2000, of said business transactions. The judge also granted the defendants' motion to dismiss, concluding that the plaintiff's remaining claims fail as a matter of law based on (1) the express provisions in the GDE Acquisition Limited Partnership agreement (GDE LP agreement) and the Equis Financial Group Limited Partnership agreement (EFG LP agreement) (collectively, the partnership agreements),[6] and (2) the absence of a fiduciary duty arising from the defendant, Gary D. Engle (Engle), and MacDonald's special relationship of trust and confidence.
On appeal, the plaintiff maintains that the judge erred for three reasons.[7] As to the motion for summary judgment, the plaintiff asserts the judge incorrectly applied a constructive knowledge standard for the required actual knowledge standard in determining the accrual date for the claims. In addition, the plaintiff argues that the judge erred in excluding James Erdekian's[8] affidavit and attached records, because such records are admissible under the business records exception, G. L. c. 233, § 78, and they present a genuine dispute as to whether MacDonald had actual knowledge of the challenged business transactions in 2000. As to the motion to dismiss, the plaintiff argues the judge erred because he disregarded § 8.6 of the partnership agreements when concluding that § 15.15 of such agreements expressly provides that the defendants could engage in other business ventures.
2. Motion to dismiss -- facts. We recite the facts alleged in the plaintiff's complaint for purposes of our review of the motion to dismiss. See Baker v. Wilmer Cutler Pickering Hale & Dorr, LLP, 91 Mass. App. Ct. 835, 842 (2017). To properly understand the background of this case and the complexity of all its moving parts, we recite the facts in detail.
A. Entities involved and respective ownership interests. In 1995, MacDonald and Engle became "50/50 partners" of Equis Financial Group (EFG).[9] ,[10] Although MacDonald and Engle's alleged oral agreement was that they would equally share the ownership of EFG, Engle, in fact, had a "majority by approximately 1 [percent] to ensure his control in the development of the businesses, assets and opportunities ... arising out of [EFG], its subsidiaries, affiliates and [e]xisting [p]rograms." EFG's various subsidiaries, affiliates, and sponsored programs included, but were not limited to, EFG LP and AFG investment trusts A, B, C, and D (AFG trusts or trusts).[11] Ninety-nine percent of EFG LP was owned by GDE LP, a limited partnership that MacDonald and Engle owned.[12] EFG LP's remaining one percent interest was owned by Equis Corporation (Equis), which Engle solely owned.
The AFG trusts' special beneficiary was EFG LP, and AFG ASIT Corporation (AFG ASIT) controlled the trusts. AFG ASIT was a "wholly-owned subsidiary of EFG LP." EFG LP and EFG's "ownership and control of AFG ASIT ... enabled EFG LP and [EFG] to profit from the opportunities arising from the control of the AFG trusts and the investments to be made by them."
In 1997, the defendants, James A. Coyne and Engle, acquired ownership of a public real estate company later known as Semele.[13] MacDonald did not have a management or other role in Semele. Engle and Coyne also owned two other entities: Equis II Corporation (Equis II) and Ariston Corporation (Ariston).
B. Challenged transactions and alleged concealment. The plaintiff alleges that "crucial material facts" of the defendants' scheme to freeze out MacDonald from Equis II and Semele "were never disclosed to MacDonald." The plaintiff also alleges that "actions were taken to mislead MacDonald about these material facts" and to "actively conceal" them from him.
The first challenged transaction occurred in July, 1997, when two of EFG's assets were sold to Equis II for, according to the plaintiff, less than fair market value. The first asset was AFG ASIT, which EFG LP sold to Equis II for a demand note of $1.1 million, its "historical cost."[14] The second asset was the class B interests in the AFG trusts.[15] ,[16] As a result, Equis II had voting control over the AFG trusts with respect to decisions that AFG ASIT could not accomplish acting alone as managing trustee and required a vote of the beneficiaries.[17] The plaintiff alleges that the defendants never disclosed to MacDonald that he did not have any ownership in Equis II, and that concealment of that material fact, and how it harmed him, was a breach of the fiduciary duty owed to MacDonald.
The second challenged transaction occurred in August, 1998, when EFG LP's interest in AFG Eireann Limited Partnership (AFG LP) and ONC LP was sold to Ariston.[18] EFG LP received stock in Ariston in exchange for the interest in these entities. Engle and Coyne then had Semele purchase the stock in Ariston from EFG LP for $2 million cash and a "non-recourse promissory note of $10,450,000."
The plaintiff also alleges that the defendants misled MacDonald and concealed from him material facts about the ownership of Equis II in EFG's 1996 and 1997 consolidated financial statements. Specifically, the plaintiff alleges that "Equis II was described as a 'corporation formed for the purpose of holding the Class B Interests' of the Trusts and as an 'Affiliate' of [EFG]," and that this description is misleading because "the same description [was] given to various entities which were owned in whole or in part by EFG LP and/or by Engle and MacDonald personally."
C. Engle's fiduciary duty to MacDonald. The plaintiff alleges that Engle had a fiduciary duty to share in future business investments on a "50/50" basis with MacDonald. Specifically, the plaintiff alleges MacDonald "held reasonable expectations that he would participate on a 50/50 basis [ ] with Engle ... in any business or entity which arose out of the business, assets and opportunities of and arising out of [EFG]." The plaintiff also alleges that MacDonald had an expectation "that new and other entities would be created and used for the development of the businesses, assets and opportunities of and arising out of [EFG] and that [he] would ultimately have a direct or indirect interest in all such entities with Engle on a '50/50 basis' with Engle in control." These expectations were based on the "special relationship of trust and confidence" that MacDonald placed in Engle.
3. Motion for summary judgment -- facts. We recite the undisputed facts in the light most favorable to the plaintiff as the nonmoving party. Dattoli v. Hale Hosp., 400 Mass. 175, 178 (1987).
The plaintiff submitted several affidavits in support of her opposition to summary judgment. One of those affidavits states that on December 28, 1999, MacDonald had a conversation with his tax accountant, Erdekian, during which MacDonald told Erdekian "words to the effect that [MacDonald] was supposed to be part of Equis II and [that] he would be part of it going forward." The plaintiff's affidavit states that she never saw "any communication or document which informed" MacDonald that assets were being sold or transferred to entities in which MacDonald had no interest, and that she believes that MacDonald would have told her had he received any such document. She further avers that MacDonald prepared a 2003 document showing his investments in 2000 - 2002, setting forth a continuing interest in "the Equis Financial Group and related entities, ... the AFG Investment Trusts, AFG Income Fund, ... AFG International LP, Kirkwood Mountain Resort, Echelon International, Kettle Valley and PLM International."
Likewise, Thomas Bergstrom, who lived with MacDonald and the plaintiff from 2004 forward, avers that MacDonald throughout that period stated on a number of occasions "the specific properties or interests which he owned with Gary Engle in the business including PLM. The properties and interests he mentioned most of all were AFG, Equis and PLM. He also mentioned their ownership of the AFG Income Fund, Durango, AFG International, Kirkwood, Echelon, and Kettle Valley as well as others."
The defendants submitted detailed affidavits in support of their motion for summary judgment. We set out here only those portions that are both based on admissible evidence and about which there is no dispute.
On December 31, 1999, in response to his request, MacDonald was sent an ownership summary of all Equis entities from Engle's attorney, Craig Mills. The plaintiff does not dispute that MacDonald requested this summary; nor does the plaintiff dispute that Mills mailed it to MacDonald on December 31, 1999. The plaintiff does not contend that the ownership summary is inaccurate or incomplete, nor does she contend it does not reflect the ownership of all of the Equis-related entities as MacDonald requested. The ownership summary showed, among other things, that: (1) Engle had sole control of Ariston; (2) MacDonald had no ownership interest in Equis II; and (3) MacDonald had no controlling interest in Semele.
At some time during 2003 - 2004, Thomas Goodwin[19] and MacDonald had a conversation during which MacDonald asked "why he did not have any ownership in Semele Group, Inc., EFG/Kettle Development or EFG Kirkwood." Goodwin informed MacDonald that "these transactions required outside equity" that Engle and Coyne provided outside of EFG LP. Goodwin "routinely" provided MacDonald with "balance sheets that indicated what assets he owned (through GDE Acquisition Limited Partnership and EFG LP)," which, according to Goodwin, precludes the possibility for MacDonald "to believe that he had an interest in Equis II, Semele, or PLM." Goodwin also prepared and sent MacDonald GDE LP tax returns that were based on GDE LP audited financial statements prepared for the years 1998 and 1999. These financial statements "disclose details regarding the Class B Interests" in the AFG trusts, "the Ariston Corporation transaction, [and] EFG LP's sale of the special beneficiary interest to Semele." In addition, Goodwin and MacDonald had a conversation in which MacDonald said "he was not interested in participating" in the "Equis II Class B Interests transaction ... given the economics of the transaction." According to Goodwin, "EFG LP received 100 [percent] of the value of the assets in these transactions since the sale prices were set sufficiently high so that EFG LP was entitled to, and did, receive all the cash flow from the assets it sold to Semele."
In addition to receiving financial documents, "MacDonald attended numerous board meetings each year, both in Florida and Colorado, where Gary Engle, Wayne Engle, Thomas Goodwin, [Coyne], and others would discuss the status of [the challenged] projects." MacDonald "served as a director (and for many years, President) of AFG ASIT Corporation, the managing trustee of the AFG Investment Trusts" and, as a director, MacDonald was well aware of the challenged transactions involving the AFG trusts, because he "often signed SEC filings disclosing details about the transactions." Moreover, MacDonald and the plaintiff, as "unit holders of AFG Investment Trust A and D," received annual reports of those trusts and the "proxy materials which were sent to all unit holders." The "proxy statement sent to unit holders of AFG Trust D, ... dated February 11, 2003, describes the 2000 acquisition of PLM by the AFG Trusts, the formation of EFG Kirkwood LLC by the AFG Trusts and Semele, and the formation of EFG/Kettle Development LLC by the AFG Trusts and Semele." This proxy statement also specifically states that "Semele is the owner of Equis II Corporation, which in turn is the owner of the Managing Trustee of the Trust," and it provides that "Engle and Coyne control a majority of interest in Semele and, through Equis II Corp., 99.61 [percent] of the Class B Interests." MacDonald was also sent an annual report,[20] dated December 31, 1998, which "discloses that EFG LP transferred its Class B Interests and its ownership of AFG ASIT Corporation to Equis II."
Discussion. 1. Summary judgment. The judge granted summary judgment in favor of the defendants with respect to the "[p]laintiff's claims arising from the sale of business assets to Equis II ... and to Semele" because such claims are barred under the three-year statute of limitations period.[21] This ruling rested on the judge's finding that the undisputed material facts demonstrate that MacDonald had knowledge of these transactions by January, 2000, at the latest. The plaintiff challenges that finding, arguing that the judge applied a constructive knowledge standard rather than an actual knowledge standard.
We review the allowance of a motion for summary judgment de novo. Targus Group Intl., Inc. v. Sherman, 76 Mass. App. Ct. 421, 428 (2010). In doing so, we "work[ ] from the same record as the motion judge" and determine "whether the evidence, viewed in the light most favorable to the losing party, establishes all material facts and entitles the successful party to a judgment as a matter of law." Ibid.
The three-year statute of limitations period for a breach of fiduciary duty claim is triggered by the claimant's actual knowledge of the action that constituted the alleged violation, and not by the claimant's knowledge of the harm that the action caused. See Doe v. Harbor Schs., Inc., 446 Mass. 245, 256-257 (2006). See also Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 518-519 (1997). The critical determination in the instant summary judgment context is whether, as a matter of law, we can identify the point at which MacDonald had actual knowledge that he did not have ownership interest in Equis II and Semele. We conclude that we can and that point occurred -- at the latest -- in January, 2000, when Attorney Mills sent MacDonald the requested ownership summary. Further, the record shows that the plaintiff failed to provide any evidence that would dispute that: (1) MacDonald requested the ownership summary in December, 1999; (2) Attorney Mills sent MacDonald the ownership summary on December 31, 1999; and (3) the ownership summary fully apprised MacDonald that he had no ownership interest in Equis II or Semele.[22]
"The mailing of a letter properly addressed and postpaid does not merely create a presumption but rather constitutes prima facie evidence of delivery to the addressee in the ordinary course of mail." Hobart-Farrell Plumbing & Heating Co. v. Klayman, 302 Mass. 508, 509 (1939) (citations omitted). See Commonwealth v. Crosscup, 369 Mass. 228, 239 (1975) ("Proper mailing of a letter is 'prima facie evidence' in civil cases of its receipt by the addressee"). "We assume that, ordinarily, people who receive a letter addressed to themselves," especially a letter that they requested from their attorney, "will read that letter and therefore be apprised of its contents."[23] State v. Quenzer, 112 Idaho 756, 758 (1987). See Meagher v. International Assn. of Machinists & Aerospace Wkrs. Pension Plan, 856 F.2d 1418, 1423 (9th Cir. 1988) (every time claimant received paycheck, he was charged with knowledge of transaction that constituted alleged violation of ERISA, and, thus, statute of limitations was triggered upon receipt).
In order for the plaintiff to have survived summary judgment based on the three-year statute of limitations, she needed to have filed her claims arising out of the challenged business transactions no later than January, 2003. The plaintiff filed the complaint on August 17, 2015. Her claims are therefore time barred.[24]
2. Motion to dismiss. "In reviewing the allowance of a motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6), [365 Mass. 754 (1974),] we proceed de novo and consider the same pleadings as the motion judge." Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 91 Mass. App. Ct. at 842. "In doing so, we accept as true all factual allegations in the complaint and draw any reasonable inferences therefrom in the plaintiff['s] favor." Ibid. "The ultimate inquiry is whether the plaintiff[ ] alleged such facts, adequately detailed, so as to plausibly suggest an entitlement to relief." Ibid. The plaintiff maintains that the judge erred in dismissing her remaining claims, i.e., that Engle breached his fiduciary duty to share all future business opportunities with MacDonald as "50/50 partners." The plaintiff argues that the judge erroneously disregarded § 8.6 of the partnership agreements when concluding that § 15.15 of such agreements expressly provides that the defendants could engage in other business ventures.
Section 15.15, titled "Other Business Ventures," of the partnership agreements reads:
"Any Partner may engage independently or with other Persons in other business ventures of every nature or description including without limitation the ownership, operation, management, syndication, sale, brokerage, and development of equipment leasing, real estate, and venture capital projects and any other projects in businesses in which the Partnership is then engaged (including competing projects). Neither the Partnership nor any other Partner shall have any rights in or to such independent ventures or the income or profits derived therefrom." (Emphasis supplied.)
Section 8.6 of the agreements reads:
"Notwithstanding anything else in this Agreement to the contrary, the General Partner may not unless it is Approved by the Partners: [A] Sell, exchange or otherwise transfer any asset of the Partnership to an Affiliate of the General Partner."
"[A]pproved by the Partners" is defined in article XVI of the partnership agreements as meaning "previously approved or consented to in writing by all Limited Partners." The plaintiff's claim that Engle had a fiduciary duty to share future business investments on a "50/50" basis with MacDonald is in direct conflict with the express provisions of the partnership agreements, including § 8.6.
The plaintiff maintains that Engle breached § 8.6 of the partnership agreements because written authorization of the sale of EFG LP's assets to Equis II and then later to Semele has neither "been produced or has ever been alleged to exist." However, contrary to the plaintiff's argument, MacDonald did in fact provide written authorization of these transactions. MacDonald filed with the United States Security and Exchange Commission Form 10-Ks that he signed on March 31, 1998, March 31, 1999, and March 30, 2000.[25] Each Form 10-K details the sale of EFG LP's assets to Equis II. For instance, the March 31, 1998, Form 10-K provides, in pertinent part, that "EFG transferred its Class B Interests to a special-purpose company, Equis II Corporation, a Delaware corporation. EFG also transferred its ownership of AFG ASIT Corporation, the Managing Trustee of the Trust, to Equis II Corporation." The March 31, 1999, Form 10-K provides the same, that "EFG ... transferred its ownership of AFG ASIT Corporation, the Managing Trustee of the Trust, to Equis II Corporation," and it indicates that Equis II owns 99.61 percent of the class B interests in the AFG trusts. The March 30, 2000, Form 10-K similarly provides that:
"EFG transferred its Class B Interests to a special-purpose company, Equis II Corporation, a Delaware corporation. EFG also transferred its ownership of AFG ASIT Corporation, the Managing Trustee of the Trust, to Equis II Corporation. As a result, Equis II Corporation has voting control of the Trust through its ownership of the majority of the Trust's outstanding voting interests, as well as its ownership of AFG ASIT Corporation."
All three Form 10-Ks state that "AFG ASIT Corporation is a wholly owned subsidiary of Equis II Corporation," and that "Equis II Corporation is controlled by EFG's President and Chief Executive Officer, Gary D. Engle."
We would be hard pressed to hold that MacDonald's signature on these Form 10-Ks, in his capacity as "President and a Director of the Managing Trustee" of AFG ASIT, does not satisfy § 8.6 of the partnership agreements requiring written approval of the sale. Because Engle did not breach his fiduciary duty in selling these assets to Equis II, we need not reach whether the later sale of these assets from Equis II to Semele was a breach of Engle's fiduciary duty, as MacDonald had no ownership interest, or even managerial role in, Equis II.[26]
Judgment affirmed.

For ease of discussion, we refer to this motion as two separate motions.

Geoffrey Alan MacDonald will hereinafter be referred to as MacDonald. MacDonald died in December, 2012.

We assume what the judge and the parties meant by "a fiduciary duty [between Engle and MacDonald] to share future business opportunities ... as '50/50' partners" was that Engle owed MacDonald a fiduciary duty based on their alleged oral agreement. On that point, the judge concluded that "any such oral agreement was superseded as a matter of law by the written partnership agreement that MacDonald and Engle both signed."

In addition to these three claims of error, the plaintiff claims the judge erred in denying her motion for discovery because she made the threshold showing necessary to obtain further discovery. See E.A. Miller, Inc. v. South Shore Bank, 405 Mass. 95, 100 (1989). As this fourth claim of error is resolved by our conclusions on the other three claims, we address it after our disposition of those claims. See note 25, infra.

Erdekian was MacDonald's tax accountant.

The alleged "50/50 partners[hip]" was based on an alleged oral agreement between MacDonald and Engle. This alleged oral agreement did not represent the actual reality of the EFG ownership. MacDonald had 49.5 percent ownership and Engle had 51 percent ownership.

MacDonald was EFG's chairman. Engle was EFG's president and chief executive officer. The defendants, James A. Coyne and Wayne E. Engle, were EFG's senior vice presidents.

EFG LP and the AFG trusts were among the core assets of EFG.

MacDonald and Engle both had a 49.5 percent ownership interest.

Coyne was Semele's chief operating officer, Engle was a member of Semele's board, and EFG LP had the right to nominate members of the board. Engle later became Semele's chairman and chief executive officer, and Coyne became Semele's president.

This demand note was made out to EFG LP, thereby giving "the power to make demand on it [to] Engle himself, who was in control of EFG LP."

The AFG trusts were controlled by AFG ASIT. AFG ASIT was a wholly owned subsidiary of EFG LP. EFG LP was ninety-nine percent owned by GDE LP and one percent owned by Equis. GDE LP was equally owned by Engle and MacDonald. Equis was solely owned by Engle.

At this time, the trusts had raised a total of approximately $173 million.

Ownership (and thus voting control) of the class B interests of the four AFG trusts was originally with EFG LP.

The general partners of AFG LP and ONC LP were Massachusetts corporations that Engle controlled.

Goodwin was MacDonald's tax advisor and tax preparer from 1996 to 2001. He was also tax advisor and tax preparer to Engle, Coyne, Wayne E. Engle, and for various entities, including EFG LP.

The annual reports were sent to all AFG trust D unit holders.

A breach of fiduciary duty claim is subject to a three-year statute of limitations period. See G. L. c. 260, § 2A ; Doe v. Harbor Schs., Inc., 446 Mass. 245, 254 (2006).

For the purpose of summary judgment, we acknowledge that the plaintiff submitted affidavits that, in general terms, can be read to raise an issue of fact whether MacDonald appreciated the import of the ownership summary dated December 31, 1999. But it does not logically follow that he did not have actual knowledge of the ownership summary and its contents.

"[W]hile receipt does not necessarily prove knowledge, receipt ... is closely related to the element of knowledge. ... Some courts have held that in certain circumstances actual notice is synonymous with knowledge. Jefferson County Bank v. Erickson, 188 Minn. 354 (1933)." State v. Quenzer, 112 Idaho 756, 758 (1987).

We need not consider Erdekian's affidavit and alleged business records. Erdekian's conversation with MacDonald on December 28, 1999, occurred before Attorney Mills sent MacDonald the ownership summary. Even if MacDonald, for arguments sake, did not have actual knowledge of his ownership interests at the time he spoke with Erdekian, he is later charged with actual knowledge when he received Attorney Mill's ownership summary. We, thus, decline to reach whether Erdekian's telephone notes qualify as a business record.

A Form 10-K is an annual report that publicly traded companies are required to file with the United States Securities and Exchange Commission each year. It provides a comprehensive summary of a company's finances. Because these documents are "matters of public record," we are allowed to consider them in reviewing the defendants' motion to dismiss. Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000).

Because we are affirming the order allowing the defendants' motion to dismiss or, in the alternative, for summary judgment, it likewise follows that the denial of the plaintiff's motion for discovery was proper.